NOT DESIGNATED FOR PUBLICATION

No. 115,131

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CHEYENNE E. STOUT,
*Appellant*,

v.

CHANUTE HEALTHCARE CENTER and PREMIER GROUP INSURANCE CO.,
*Appellees.*

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed December 2, 2016. Affirmed.

*William L. Phalen*, of Pittsburg, for appellant.

*Terry J. Torline*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellees.

Before BRUNS, P.J., GREEN, J., and WILLIAM S. WOOLLEY, District Judge, assigned.

*Per Curiam*: Cheyenne E. Stout appeals from the decision of the Workers Compensation Board (Board) affirming the decision of the administrative law judge denying her workers compensation benefits. Specifically, the Board concluded that Stout "did not prove personal injury by accident arising out of and in the course of her employment, including that she failed to prove her accident was the prevailing factor in her injury, need for medical treatment and any resulting disability." Based on our review of the record as a whole, we find that the Board's decision is supported by substantial competent evidence. Moreover, we conclude that the Board did not discriminate against Stout. Thus, we affirm.

1

In January, 2012, Stout—who was 18 years old—began working as a certified nursing assistant (CNA) at Chanute Healthcare Center. According to Stout, she was lifting a resident of the nursing home sometime between 11 a.m. and 1 p.m. on March 22, 2012, when her back gave out and she fell to the floor. Following the alleged accident, Stout went to see Dr. Greta McFarland, who had been her pediatrician.

Dr. McFarland's notes from the visit state:

"Since she woke up this am, the back was hurting in this same area. She did go to work. She is a CNA at Chanute health care, and around 11 am she was holding someone, and then had shooting pains in the middle of the back and some on the right lumbar area. She fell completely down, landing on her buttocks. The pain occurred suddenly. . . . It hurts all the time, with laying down or walking or sitting. The shooting pain is with activating, and with sitting, it just hurts. . . . She had not had pain before this, however over the last 2 weeks, she had noted that when she would bend forward, it felt like the back was 'stuck,' but she could get it to move."

Dr. McFarland referred Stout to Brett Olson—a physician assistant (P.A.) for Dr. William Dillon—regarding her back pain. Olson saw Stout the next day and noted that she:

"presents to the clinic today with back pain in the lumbar spine that started yesterday when she woke up. The patient states that the pain is mostly midline, however the left does hurt slightly worse than the right. She describes it as sharp in nature. She has no known injury, however, she does do a lot of lifting at her job. She denies any radicular symptoms or any weakness in the legs."

Olson gave Stout a prescription for physical therapy and restricted her from lifting at work until she could be examined again in a week. On the same day, Stout filled out a workers compensation reporting form in which she asserted that the incident occurred on

March 22, 2012, 11:30 a.m. and that she had reported it to her employer the next day. She further wrote: "I was having severe back problems & I went to the doctor & orthopedic. They said I am having back [spasms] due to lifting residents."

After receiving the report form from Stout, Chanute Healthcare sent her to see Thomas W. Cloven, P.A., for an evaluation. Cloven was also able to see her on March 23, 2012, and his notes state in part:

> "Recently, while lifting a resident, either the patient or the resident lost his/her balance, which caused a sudden increase in the load and strain on the patient's back. The patient did not report this immediately to her supervisor. She saw Dr. McFarland here at the clinic yesterday. Dr. McFarland sent the patient to see Brett Olson, PA-C . . . ."

Cloven agreed with Olson's recommendations of rest, medication, heat application, physical therapy, and no work until March 31, 2012. Moreover, he stated that Stout should see him again before returning to work. A review of the record reveals that Stout did not return to see Olson again until July 31, 2012. Moreover, it appears that Stout never returned to work for Chanute Healthcare. Instead, she accepted a job with Applewood Rehabilitation on May 13, 2012, as a CNA.

Olson's notes from Stout's visit on July 31, 2012, reflect that she saw him for "low back pain and left leg radicular symptoms" and that he ordered an MRI. The next day, Stout had the MRI performed by Neosho Regional Medical Center. The MRI patient screening form states that the reason for the exam was: "lower back pains & pains in lt leg. 0 injury—1 1/2 wks ago pain got worse—limited ROM." Furthermore, the MRI showed that Stout had degenerative changes in her spine from L3-S1, a minor herniated disc at L3-4, a herniated disc at L5-S1, and facet joint arthritis at L3-4 and L4-5.

Two days later, Stout returned to see Olson, who reviewed the MRI results and recommended medication as well as physical therapy. Stout saw Olson again on August

3

20, 2012. Evidently, she told Olson that medication did not provide her with relief from her back pain. Stout also indicated that she was unable to complete therapy because she got the flu. Olson recommended epidural injections. Another doctor subsequently performed a series of three epidural injections.

Olson also referred Stout to Dr. Brent Adams, an orthopedic spine surgeon, for additional evaluation. Dr. Adams examined Stout on October 26, 2012, at which time she completed a drawing showing where she had pain. On the drawing, she indicated that she had stabbing pain in her left lower back and possibly her buttocks but did not indicate that she had any pain in her left leg. Moreover, Dr. Adams reported that Stout had no radicular complaints. He interpreted the MRI results as revealing degenerative disc disease at L3-4, L4-5, and L5-S1 with disc dehydration. Accordingly, Dr. Adams recommended ongoing conservative care.

On November 15, 2012, Stout filed an application for hearing with the Kansas Department of Labor's Division of Workers Compensation in which she sought recovery for the injury she alleged to have suffered on or about March 22, 2012. Prior to the hearing, she was seen by Dr. George Fluter—a physician—at the request of her attorney. Dr. Fluter noted that Stout had low back/left thigh pain, lumbosacral strain/sprain, multilevel lumbar discopathy, probable facet arthrosis, and probable sacroiliac joint dysfunction. He opined that there was a causal relationship between Stout's medical condition and her reported work-related accident.

Subsequently, Stout's deposition was taken. In her deposition, she testified that around 1 p.m. on March 22, 2012, she was lifting a patient off of his bed at Chanute Healthcare Center to put him into his wheelchair when she fell to the ground because her back gave out. She further testified that the only people in the room at the time of the accident were her and the patient. She testified that she knew which patient she was lifting, so the attorney for Chanute Healthcare Center had her identify him by his initials.

4

According to Stout, she reported the accident to her charge nurse as soon as the patient had been safely returned to his bed.

Stout testified that the left side of her lower back was injured and that the pain went down into her left leg. In addition, she testified that she had never had problems with her back before the alleged accident at Chanute Healthcare Center. Stout indicated that after she reported the accident to her charge nurse, she decided to go see Dr. McFarland during her lunch break, which she took sometime after 1 p.m.

During the deposition, Chanute Healthcare Center's attorney asked Stout about Dr. McFarland's notes from March 22, 2012, which state that Stout woke up that morning with her back hurting in the same area. Stout responded by saying that the information recorded by Dr. McFarland was not true. She also testified that she did not tell Dr. McFarland that she was lifting a resident around 11 a.m. Instead, she testified that the time of the accident was around 1 p.m. Stout further testified that Dr. McFarland's notes were inaccurate where they stated that she had some pain in the right lumbar area. Likewise, she testified that Dr. McFarland's notes were not accurate when they said that for approximately 2 weeks, Stout "had noted that when she would bend forward it felt like the back was stuck but she could get it to move."

Additionally, Stout testified that Olson's notes were inaccurate where they indicated that she saw him the day following the accident "with back pain in the lumbar spine that started yesterday when she woke up." When Chanute Healthcare Center's attorney questioned Stout about Olson's notes stating that her pain was mostly midline, she testified that it actually only hurt on the left side. Moreover, Stout testified that Olson's note that she had denied any radicular symptoms—which Chanute Healthcare Center's attorney explained meant "going down your leg"—was also not true.

5

Similarly, when asked about Cloven noting that during the incident, "either the patient or the resident lost his/her balance, which caused a sudden increase in the load and strain on the patient's back," Stout testified that this was also inaccurate. Instead, she stated that it was the pain in her back that caused her to fall. She also testified that Cloven had inaccurately stated in his notes that she had not immediately reported the alleged accident to her supervisor at Chanute Healthcare Center.

Stout testified that she was released to return to work with a restriction on lifting on March 31, 2012. However, she indicated that the job Chanute Healthcare Center offered her required lifting, so she did not return to work there. On May 13, 2012, Stout began working as a CNA at Applewood Rehabilitation Center. She testified that although this job involved taking care of residents, there was no lifting required. In addition, she testified that she continued to work at Applewood Rehabilitation Center until January 1, 2013. At that time, she got a higher-paying job at Tri-Valley Developmental Services. In this job, she checks on clients at their homes and helps them with chores such as cleaning, cooking, or grocery shopping.

An administrative law judge (ALJ) held a preliminary hearing on June 12, 2013. Stout and her mother testified at this hearing. In addition, Stout's medical records were admitted into evidence. After considering the evidence, the ALJ found that although he did not find her testimony to be very credible, he would give Stout the benefit of the doubt and refer her for an independent medical examination (IME). The following day, the ALJ issued a preliminary hearing order in which he determined that the medical expenses incurred to that date were to be paid as authorized medical expenses but noted that Chanute Healthcare Center might be entitled to reimbursement if it was subsequently determined that she was not entitled to relief. The ALJ also took Stout's request for additional treatment under advisement pending receipt of the IME report.

6

On August 12, 2013, Dr. Paul Stein—the neurosurgeon appointed by the ALJ—conducted the IME. Dr. Stein found that Stout had degenerative pathology that was not typical of a person who is 18 years of age. He opined that "[g]iven the mechanism of injury and the degenerative changes the primary or prevailing factor in the current symptomatology and need for treatment is the preexisting degenerative change." Furthermore, in a deposition taken on January 14, 2014, Dr. Stein testified that although trauma can cause a disc to herniate, it would take considerable trauma for a normal disc to do so. In his opinion, it would be very uncommon for a normal disc to herniate simply from lifting or bending.

Dr. Stein testified that according to Stout's MRI scans, she has a herniated disc at L5-S1 and that this herniation would likely be sufficient to cause her left-sided back pain. Dr. Stein noted that Olson's diagnosis on July 31, 2012, was low back pain with left leg radiculopathy. He also testified that Stout had disc protrusion and nerve root impingement, and he agreed that she had no history of low back pain or radiculopathy before she was lifting a patient at Chanute Healthcare on or about March 22, 2012.

Dr. Stein testified that all three of Stout's lower discs were desiccated. In his opinion, Stout's herniated disc—L5-S1—was desiccated before the alleged accident at Chanute Healthcare Center. Although he testified that surgery would be a treatment for her pain, he would not recommend it for her. Instead, he recommended conservative treatment. Further, he opined that the disc desiccation was not caused by Stout's work activities. Dr. Stein testified that lifting a patient at work was likely a factor in causing her herniated disc at L5-S1. But he stated that "in a healthy normal 19-year-old back, a herniation should not occur."

Chanute Healthcare Center's attorney asked Dr. Stein whether his opinion would be changed by the two medical reports in which it was reported that Stout woke up with back pain on the day of her injury. Dr. Stein testified that that information would not

7

change his opinion, but he believed it would make it easier to have stated his opinion. He explained, "My opinion was based on a more likely than not, which may have been 50.5 percent compared to 49.5 percent. If the pain had started before she went to work, it would probably be more like 80/20."

Dr. Stein noted that Stout complained of anterior thigh pain but opined that such pain would not come from an L5-S1 disc herniation. Rather, such pain might come from hip disease or possibly an L3-4 disc herniation. Dr. Stein stated that a herniation of the L5-S1 disc can create pain in the "posterior thigh in to the calf in to the outer toes." But if the radicular complaints were related to the L5-S1 disc and did not begin until July of 2012, it would be more likely than not that the disc did not rupture until after the alleged accident at work. In fairness, he pointed out that this did not mean that the disc was not injured in March of 2012. Dr. Stein could not say whether the lifting at work caused the injury at L3-L4, which was a more than a bulging disc but was not an actual herniation. He testified that all of his opinions came from the assumption that the back pain specifically started with the lifting—because that was what Stout told him had happened.

On January 31, 2014, the ALJ entered a preliminary hearing order in which he concluded that Stout had failed to meet her burden of proof that she sustained personal injury by accident arising out of and in the course of her employment. The ALJ also found that "whatever occurred on March 22, 2012, was not the prevailing factor in causing [Stout's] injury, need for treatment or resulting impairment or disability." Subsequently, the Board affirmed the ALJ's order.

On June 12, 2014, Dr. Fluter prepared a supplemental report at the request of Stout's attorney. In his supplemental report, Dr. Fluter gave his opinions regarding an impairment rating, physical restrictions, and future medical treatment. In addition, he opined that the alleged accident at Chanute Healthcare Center on March 22, 2012, was the prevailing factor in causing Stout's injuries and need for subsequent treatment.

8

On February 6, 2015, Stout had her deposition taken again for an update on her condition. Stout testified that she had not had any additional medical care for any of her problems but that she continued to have pain in the lower left side of her back and extending down her left leg. She also testified that she had not had any new injuries. According to Stout, she was able to work at nonstrenuous jobs since her injury. Moreover, she testified that she did not know that she had any degenerative problem in her back before she took the job at Chanute Healthcare Center.

On cross-examination, Chanute Healthcare Center's attorney asked Stout about the MRI patient screening form that contained handwritten statements at the bottom: "Lower back pains & pain in lt leg. 0 injury—1 1/2 wks ago pain got worse—limited ROM." Stout testified although she wrote the first sentence regarding lower back and leg pain, she did not write the rest of the statement. She also testified that the additional statements were not on the form when she signed it. In addition, Stout indicated that she did not tell anyone that she did not have an injury or that her pain had gotten worse 1 1/2 weeks prior to the MRI.

On May 14, 2015, the parties took an evidentiary deposition of Dr. Fluter. For the most part, he testified consistent with his written reports. He testified that the things he found upon physical examination of Stout that were consistent with her being injured on March 22, 2012, while at work at Chanute Healthcare were (1) her gait was slightly antalgic; (2) she had some slight weakness of extension in her big toe of her left foot; (3) her reflexes were physiologic, but the left sided reflexes at her knee and ankle were slightly less active than on the right side; (4) her straight-leg raising from a seated position was approximately 90 degrees on the right and only 75 degrees on the left; (5) her straight-leg raising from a supine position was approximately 60 degrees on the right with hamstring tightness and 30 degrees on the left with back pain; (6) she had tenderness to palpitation in the lower vertebral muscles on the left side as well as tenderness over the left sacroiliac joint; (7) her lumbar range of motion was limited in a nonuniform manner;

9

and (8) she had pain with forward flexion and extension of the spine as well as with right lateral bending and rotation.

Dr. Fluter further testified that he diagnosed Stout with "lumbar sprain/strain injury with myofascial component. Possible radiculopathy based on the clinical findings. And then sacroiliac joint dysfunction on the left side." In addition, he rendered the opinion that there was a causal relationship between Stout's work accident on March 22, 2012, and her back injury. Dr. Fluter testified that Stout suffered a sprain/strain injury, which is different from degenerative changes. Moreover, he stated that he had factored in the degenerative condition of Stout's lumbar spine when rendering his prevailing-factor opinion. Although the degenerative changes were a factor, Dr. Fluter did not believe they were the prevailing factor.

On cross-examination, Dr. Fluter recognized that there were notes in the medical records—specifically regarding when Stout's back pain actually began—that were inconsistent with the medical history Stout had given to him. He also recognized that the statement in the MRI patient screening form that indicated she had no injury was also inconsistent with the medical history he had received from Stout. Dr. Fluter also testified that he did not examine Stout again or review any additional medical records before issuing his supplemental report.

On July 23, 2015, the ALJ rendered a decision in which he concluded that Stout "has failed to sustain her burden of proof of having suffered personal injury by accident arising out of and in the course of her employment with [Chanute Healthcare Center]." Instead, the ALJ found that Stout woke up with back pain on the morning of the alleged work-related accident. He also found that "she reported a significant increase in low back pain and onset of radicular symptoms in the two weeks leading up to July 31, 2012, while employed as a CNA with Applewood Rehabilitation." Finally, the ALJ found that Stout "has also failed to sustain her burden of proof that there were any unpaid medical bills,

10

that she is entitled to future medical treatment, or that the provisions of the Kansas Workers Compensation Act are unconstitutional." On August 4, 2015, Stout filed a request for review by the Board.

On December 28, 2015, the Board issued a 13-page order concluding that Stout "did not prove personal injury by accident arising out of and in the course of her employment with [Chanute Healthcare Center]." In particular, the Board agreed with the ALJ's opinion that Stout's credibility regarding her medical history was questionable. In fact, the Board noted: "By our count, claimant testified documents prepared by at least five medical professionals were false, wrong or inaccurate. Claimant would have been the source for such information."

Additionally, the Board concluded that Stout "did not have radicular symptoms until July 31, 2012," and agreed with the ALJ's "assessment that something happened to [Stout] in July 2012 to cause her radicular symptoms." Further, the Board found it significant that the medical records showed that Stout "woke up with pain on March 22, 2012, and had a feeling as if her back was catching for two weeks prior." Ultimately, the Board affirmed the July 23, 2015, ALJ award but found that it could not "address the constitutionality of the Act."

ANALYSIS

On appeal, Stout contends that the Board erred in finding she failed to meet her burden of proof that she suffered personal injury by accident arising out of and in the course of her employment. In addition, she contends that the Board erred in finding that the alleged work-related accident was not the prevailing factor causing her injury. Finally, she contends that the Kansas Workers Compensation Act is unconstitutional in that it violates her right to equal protection.

11

*Substantial Evidence*

Final orders of the Board are subject to review under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq*. K.S.A. 2015 Supp. 44-556(a). The standard of judicial review under the KJRA varies, depending upon the issue raised. See K.S.A. 2015 Supp. 77-621. Because Stout does not even cite the KJRA in her brief, it is difficult for us to determine the basis for her requested relief. Nevertheless, we will construe her arguments as alleging that the Board's action was based on determinations of fact that are not supported by substantial competent evidence in light of the record as a whole. See K.S.A. 2015 Supp. 77-621(c)(7).

In deciding whether there is substantial competent evidence to support the Board's factual findings, we must review the entire record to determine whether the findings are supported by substantial evidence. See K.S.A. 2015 Supp. 77-621(c)(7).

> "'[I]n light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 2015 Supp. 77-621(d).

It is important to note that we are not to weigh the evidence except to determine whether the evidence supporting the Board's decision has been so undermined by conflicting evidence that we no longer have confidence that the evidence is substantial. *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, 363, 212 P.3d 239 (2009). The term "substantial evidence" is not statutorily defined, but the Kansas

12

Supreme Court has found that it refers to evidence possessing something of substance and relevant consequence, which induces the conclusion that the award was proper and furnishes a basis of fact from which the issue raised easily could be resolved. *Saylor v. Westar Energy, Inc.*, 292 Kan. 610, 614, 256 P.3d 828 (2011).

The Kansas Workers Compensation Act provides that an employer is liable to pay compensation to an employee that suffers personal injury by accident arising out of and in the course of employment. K.S.A. 2011 Supp. 44-501b(b). Whether an accident arises out of and in the course of employment is a question of fact. *Scott v. Hughes*, 294 Kan. 403, 415, 275 P.3d 890 (2012). See K.S.A. 2011 Supp. 44-508(f)(3)(A)(i). The burden of proof is on the claimant to establish his or her right to an award. K.S.A. 2011 Supp. 44-501b(c). "'Burden of proof' means the burden of a party to persuade the trier of facts by a preponderance of the credible evidence that such party's position on an issue is more probably true than not true on the basis of the whole record." K.S.A. 2011 Supp. 44-508(h).

An injury is not compensable if work was merely a triggering or precipitating factor. Likewise, an injury is not compensable solely because it aggravates, accelerates, or exacerbates a claimant's preexisting condition or renders a preexisting condition symptomatic. K.S.A. 2011 Supp. 44-508(f)(2). Further, the phrase "arising out of and in the course of employment" does not include injury that occurred as a result of the natural aging process or by the normal activities of day-to-day living. K.S.A. 2011 Supp. 44-508(f)(3)(A)(i).

K.S.A. 2011 Supp. 44-508(f)(2)(B) provides that an injury is only to be deemed to arise out of employment if two factors are met: "(i) There must be a causal connection between the conditions under which the work is required to be performed and the resulting accident; and (ii) the accident is the prevailing factor causing the injury, medical condition, and resulting disability or impairment." "Prevailing" as it relates to the term

13

"factor" means the primary factor, in relation to any other factor. K.S.A. 2011 Supp. 44-508(g).

Accordingly, our task is to determine whether the evidence supporting the Board's decision has been so undermined by other evidence that it is insufficient to support the Board's conclusion. *Lake v. Jessee Trucking*, 49 Kan. App. 2d 820, Syl. ¶ 4, 316 P.3d 796 (2013). We are to review a challenge to the Board's factual findings in light of the record as a whole to determine whether the findings are supported by substantial evidence. See K.S.A. 2015 Supp. 77-621(c)(7). This requires us to (1) review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility determinations, if any; and (3) review the agency's explanation as to why the evidence supports its findings. We do not, however, reweigh evidence or engage in de novo review. K.S.A. 2015 Supp. 77-621(d); *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

Based on our review of the record as a whole, we conclude that there is substantial evidence to support the Board's decision. Although there is certainly conflicting evidence in the record regarding when Stout first suffered an injury as well as when she first reported the alleged accident to her employer, we do not find that it is sufficient to undermine the Board's decision. Obviously, the Board had difficulty with Stout's credibility, as did the ALJ. In particular, the Board questioned Stout's denial regarding the notes made by Dr. McFarland on the day of the alleged work-related accident. These notes indicate that Stout woke up that morning with back pain and that she had had the feeling her back was sticking for the prior 2 weeks.

Similarly, the Board found the notes of the PA who Stout saw the next day that indicate that she had "back pain in the lumbar spine that started yesterday when she woke up" and that she had "no known injury" that precipitated the pain. The PA also noted that Stout "denies any radicular symptoms or any weakness in the legs." Among other things,

14

the Board found the notes of Dr. Adams regarding lifting that Stout did subsequent to her work at Chanute Healthcare Center to be significant as well as the fact that Stout did not identify the resident she was allegedly lifting at the time of her injury in her accident report.

In addition to questioning Stout's credibility, the Board found the opinions of Dr. Stein—who was appointed by the ALJ as an independent medical examiner—to be persuasive. Dr. Stein found that Stout had degenerative pathology that was not typical of a person who is 18 years of age. Furthermore, he rendered the opinion that "[g]iven the mechanism of injury and the degenerative changes the primary or prevailing factor in the current symptomatology and need for treatment is the preexisting degenerative change." Moreover, he opined that "in a healthy normal 19-year-old back, a herniation should not occur." Although Dr. Stein did not say that a subsequent accident actually occurred, he observed that Stout initially reported only back pain and that her left leg pain is not identified in any of the medical records until July 31, 2012.

We have also reviewed the evidence presented by Stout in support of her award claim. In addition to her own testimony and the medical records, she introduced the deposition of Dr. Fluter, who examined Stout at the request of her attorney. Dr. Fluter testified that his physical examination of Stout revealed findings that were consistent with her being injured at the Chanute Healthcare Center on March 22, 2012. Accordingly, he rendered the opinion that there was a causal relationship between Stout's alleged accident on March 22, 2012, and her back injury.

Specifically, Dr. Fluter testified that Stout suffered a sprain or strain injury, which is different from degenerative changes. Moreover, Dr. Fluter stated that he had factored in the degenerative condition of Stout's lumbar spine as a factor when rendering his prevailing-factor opinion, he did not believe they were the prevailing factor. Rather, he opined that the alleged work-related accident was the prevailing factor. Dr. Fluter

15

recognized, however, that there were notes in the medical records—specifically regarding when Stout's back pain actually began—that were inconsistent with the medical history she had reported to him.

Nevertheless, as indicated above, we are not to reweigh the evidence, determine the credibility of witnesses, or exercise de novo review. Although our conclusion may or may not have been the same as that of the Board, there is substantial evidence in the record—viewed as a whole—to support the conclusion that Stout's back pain actually started prior to the alleged accident at Chanute Healthcare Center on March 22, 2012. Therefore, the Board did not err in determining that Stout "did not prove personal injury by accident arising out of and in the course of her employment with respondent."

Because there is substantial evidence in light of the record as a whole to support the finding that Stout failed to meet her burden to establish that her injury resulted from an accident arising out of and in the course of her employment at Chanute Healthcare Center, it is not necessary for us to reach her second issue. We pause to note, however, that there is also substantial evidence in light of the record as a whole to support the Board's determination "that she failed to prove her accident was the prevailing factor in her injury, need for medical treatment and any resulting disability." Specifically, Dr. Stein rendered the opinion that the prevailing factor in Stout's injury and medical condition was her preexisting degenerative disc disease and not the alleged work-related accident.

*Equal Protection*

We also briefly note Stout's assertion that the "prevailing factor" requirement violates her right to equal protection because it purportedly treats her differently than other workers with similar injuries. The prevailing factor requirement was added by the 2010 Kansas Legislature as part of significant changes to the Kansas Workers

16

Compensation Act. See Substitute for H.B. 2134, effective May 15, 2011. These changes included the addition of a requirement that an accident or cumulative trauma be the prevailing factor in causing a compensable injury, medical condition, or resulting impairment.

We find this case to be significantly different than *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 830 P.2d 41 (1992). In *Stephenson*, the Kansas Supreme Court determined that it was unconstitutional to treat a repetitive injury different from a single trauma in workers compensation cases. Specifically, it was held that the statute in question—which was subsequently repealed—allowed "workers suffering similar injuries caused by the same condition to be treated different. Such treatment is arbitrary discrimination and not classification." 250 Kan. at 782. In other words, our Supreme Court found no rational basis for the discrimination and held that the statute violated the Equal Protection Clause of the United States Constitution. 250 Kan. at 780-82.

In the present case, the Board denied Stout's claim for workers compensation because it determined that her injuries did not arise out of and in the course of her employment at the Chanute Healthcare Center. In other words, the Board found that Stout's injury was not caused by the alleged accident on March 22, 2012, but by a preexisting condition. As we discussed above, there is substantial evidence in light of a review of the record as a whole to support this conclusion.

Furthermore, even if we assume that a claimant with a preexisting degenerative back injury is similarly situated to a claimant with no history of a degenerative back injury, there is a rational basis to treat the two differently. In particular, the Kansas Legislature made a policy decision to add the prevailing factor requirement so that claimants who have preexisting medical conditions can only recover if a work-related accident is the "primary factor, in relation to any other factor" in causing the injury or medical condition for which they are seeking the award. K.S.A. 2011 Supp. 44-508(g). It

17

is important to recognize that a claimant with a preexisting medical condition is not automatically precluded from receiving an award. Rather, a claimant is only precluded from recovery if his or her preexisting condition is the primary—or prevailing—factor in causing the injury as determined from all relevant evidence submitted by the parties.

Accordingly, we conclude that the Board did not discriminate against Stout. Rather, the Board simply denied her claim because she did not meet her burden of proof as set forth in the Kansas Workers Compensation Act. We, therefore, conclude, that the Board's decision does not violate the Equal Protection Clause.

Affirmed.